[No. 71181-0.   En Banc.]
Argued January 17, 2002.     Decided October 3, 2002.

SAMUEL'S FURNITURE, INC., ET AL., *Petitioners*, v. THE DEPARTMENT OF ECOLOGY, *Respondent*.

442

*Kurt A. Denke*, for petitioners Samuel's Furniture, Inc. and Jaffa Holdings, Inc.

*Heather A. Wolf* (of *Langabeer, Tull & Lee, P.S.*), for petitioner City of Ferndale.

*Christine O. Gregoire, Attorney General*, and *Thomas C. Morrill* and *Thomas J. Young, Assistants*, for respondent.

*Greg Overstreet* and *Timothy D. Ford* on behalf of Building Industry Association of Washington, amicus curiae.

*Timothy D. Ford* on behalf of National Federation of Independent Business and Washington Association of Realtors, amici curiae.

BRIDGE, J. — Petitioners Samuel's Furniture, Inc., and Jaffa Holdings, Inc. (Samuel's) seek reversal of a Court of Appeals opinion in favor of the Department of Ecology (Ecology). Samuel's contends that Ecology was required to appeal the City of Ferndale's (City) decision to issue fill and grade and building permits and to rescind a stop work order because Samuel's proposed construction project was not within the shoreline jurisdiction of the Shoreline Management Act of 1971 (SMA), chapter 90.58 RCW, under the rules established by the Land Use Petition Act (LUPA),

chapter 36.70C RCW. The Court of Appeals held that because Ecology had authority to review local government decisions to enforce the SMA, Ecology was not required to file a LUPA petition in order to challenge the City's decision. We hold that Ecology is required to file a timely LUPA petition in order to challenge a local government's decision to allow a development project when the local government has determined that the project is not within the shoreline jurisdiction.

I

Pursuant to the SMA, in 1981 the City adopted a Shoreline Master Program (SMP), which included a shoreline jurisdictional map. As required by RCW 90.58.090, Ecology approved the City's SMP, including the jurisdictional map. In 1983, the Federal Emergency Management Agency (FEMA) performed a flood study in connection with the National Flood Insurance Program (NFIP). The study identified a "regulatory floodway" for NFIP purposes. The FEMA regulatory floodway was not adopted for purposes of the City's SMP.

In 1990-91, Samuel's built a furniture store on Main Street in Ferndale. It was not required to obtain a shoreline permit for this construction project. In 1998, Samuel's began the process of building an extension to its store. It consulted with the City to obtain the necessary permits for the project. The City concluded that Samuel's would need a fill and grade permit, which would authorize the placement of fill on the property, and a building permit, to allow the construction of the extension to the store. Relying on the approved SMP map, the City determined that a shoreline permit was not necessary because the proposed construction project was not within the shoreline jurisdiction.

As part of the application process, Samuel's was required to submit a State Environmental Policy Act (SEPA), chapter 43.21C RCW, checklist to the City and Ecology. In answering the questions on the SEPA checklist, Samuel's

indicated that the project was in the "immediate vicinity" of the Nooksack River and within the 100-year floodplain of the Nooksack River.[1] Ecology did not raise any concerns regarding the project.

In August 1998, the City issued Samuel's a fill and grade permit. Pursuant to the permit, Samuel's placed 14,000 cubic yards of fill on the site in 1998. The City issued Samuel's a building permit in April 1999 and Samuel's began preconstruction demolition.

In early August 1999, Ecology contacted the City after learning about the Samuel's project from a concerned citizen. Relying on the FEMA floodway map, Ecology asserted that the Samuel's project was within the shoreline jurisdiction and that construction could not proceed without obtaining a substantial development permit. After an initial meeting with Ecology, the City issued a stop work order on August 6, 1999. However, after reviewing its SMP and shoreline jurisdictional maps, the City again determined that the project was not within the shoreline jurisdiction. It withdrew the stop work order on August 10, 1999. Ecology did not appeal this decision.

Ecology maintained to Samuel's that the Shorelines Hearings Board (SHB) had held that the Ferndale shoreline jurisdiction was based on the FEMA floodway designation, not on the City's SMP mapping.[2] Under this interpretation, Ecology argued that the fill placed on the property was within the 100-year floodplain and the FEMA floodway for

---

[1] Clerk's Papers (CP) at 486.

[2] CP at 585-86 (citing *Barrett Lake Found. v. City of Ferndale* [hereinafter *Ferndale*], Nos. 98-34, 98-36, Shorelines Hr'gs Bd. Final Findings of Fact, Conclusions of Law and Order (Mar. 29, 1999), *rev'd by* unpublished opinion noted at 109 Wn. App. 1020, 2001 WL 1463812); Report of Proceedings (Apr. 21, 2000) at 4. In *Ferndale*, the SHB stated that "[t]he City adopted the 1983 FEMA map as its flood ordinance regulation map." *Ferndale* at 5 (CP at 517). However, the City's flood ordinance is separate from and serves a different purpose than its SMP. Furthermore, the central issue in *Ferndale* was whether certain wetlands established shoreline jurisdiction. Because SMA jurisdiction could not be established through either the SMP floodway or the FEMA floodway, the SHB statement was at best dictum.

the Nooksack River.[3] Ecology informed Samuel's that it would be unable to obtain a shoreline substantial development permit because the area at issue would be considered a conservancy shoreline environment. It asserted that this area was undesignated under the City's SMP because the City had erroneously failed to include it within its SMP. Pursuant to SMP 3.15.060(5), an undesignated area is "deemed to carry the designation of that adjoining [shoreline] property having the least intensive use."[4] In the case of Samuel's property, the least intensive adjoining property carries a conservancy shoreline designation, which prohibits commercial development, including the placement of fill.

Although the City believed that the project was not within the shoreline jurisdiction, it suggested that Samuel's obtain a letter of map revision (LOMR) from FEMA to remove the portion of Samuel's property at issue from the FEMA floodway designation. Samuel's sought and obtained the LOMR, thus removing the property from the FEMA floodway.[5] Ecology subsequently admitted that the FEMA floodway did not by itself establish the shoreline jurisdiction for SMA purposes. Ecology, however, held to its position that a portion of the project was still within the shoreline jurisdiction. It threatened to take enforcement action against Samuel's if the work on the project resumed.

In January 2000, Samuel's filed this declaratory judgment action in superior court, requesting that the court determine whether the site was within the shoreline jurisdiction.[6] Samuel's then moved for summary judgment arguing that the project was outside the shoreline jurisdiction

---

[3] Property within the 100-year floodplain is not necessarily within the jurisdiction of the SMA. SHORELINE MANAGEMENT GUIDEBOOK (2d ed. 1994) (providing local governments with three options for designating shoreline jurisdiction within their SMPs, two of which do not include the entire area of the 100-year floodplain). CP at 676, 678-81.

[4] CP at 355.

[5] Ecology subsequently petitioned FEMA to reevaluate the LOMR. The current status of the LOMR is unclear from the record.

[6] Over its objection, the City was joined as a party at the trial court and filed a concurrence with Samuel's at the Court of Appeals. *Samuel's Furniture, Inc. v.*

and that Ecology was estopped from challenging the City's jurisdictional decision because Ecology had failed to appeal the decision within the 21-day statutory period under LUPA. Ecology filed a cross motion for summary judgment.

After a hearing on the motions, the trial court granted Samuel's motion for summary judgment. The trial court ruled that Ecology had waived its ability to challenge the City's jurisdictional decision by failing to appeal the City's decision to issue either the fill and grade or building permits or to withdraw the stop work order under LUPA. Thus, it held that Ecology was unable to take an enforcement action against Samuel's on that ground. The trial court also found that Ecology was bound by the City's jurisdictional determination under agency principles. The trial court did not decide whether the Samuel's property at issue was within the shoreline jurisdiction. Ecology appealed.

The Court of Appeals, Division One, reversed.[7] The court held that LUPA was not applicable in this situation because it allowed appeals only from a land use decision that was a " 'final determination by a local jurisdiction's body or officer with the highest level of authority to make the determination[.]' "[8] Because the court concluded that the SMA gave Ecology the authority to review local government decisions pursuant to RCW 90.58.050, a local jurisdiction decision was not final for purposes of LUPA. The court also rejected the trial court's agency ruling, holding that the City's decision was not directed or controlled by Ecology. Finally, the court remanded the issue of whether Samuel's property was within the shoreline jurisdiction to the trial court. This court granted Samuel's petition for review.[9]

---

*Dep't of Ecology*, 105 Wn. App. 278, 283 n.1, 19 P.3d 474 (2001). The City has not filed any papers in this proceeding.

[7] *Samuel's Furniture*, 105 Wn. App. at 290.

[8] *Id.* at 285 (quoting RCW 36.70C.020(1)).

[9] *Samuel's Furniture, Inc. v. Dep't of Ecology*, 145 Wn.2d 1001, 35 P.3d 380 (2001).

II

The single issue before this court is whether Ecology is prevented from collaterally attacking the City's determination that the Samuel's project is outside the shoreline jurisdiction because it failed to file a timely LUPA petition challenging the City's decision to issue either the fill and grade or building permits or to withdraw the stop work order.

A

Statutory Schemes

This case presents the intersection of the SMA and LUPA. The SMA was enacted to protect and manage the shorelines of Washington State to foster all reasonable and appropriate uses, while protecting against adverse effects to public health, land, vegetation, wildlife, and the rights of navigation. RCW 90.58.020. In order to effect its purpose, the SMA is to be construed liberally. RCW 90.56.900.

The SMA creates a cooperative system between local and state governments. RCW 90.58.050. It requires that local governments develop master programs for the regulation and use of their shorelines. RCW 90.58.080. A "master program" is the "comprehensive use plan for a described area, and the use regulations together with maps, diagrams, charts, or other descriptive material and text, a statement of desired goals, and standards developed in accordance with the policies enunciated in RCW 90.58.020." RCW 90.58.030(3)(b). All master programs must be approved by Ecology, RCW 90.58.090, and, once approved, "constitute [the] use regulations for the various shorelines of the state." RCW 90.58.100(1).

█ No development may occur on a shoreline of the state unless it is consistent with the policy of the SMA and a permit is first obtained. RCW 90.58.140(1), (2). The administration of the permit system "shall be performed exclusively by the local government." RCW 90.58.140(3). Appeals

of decisions to grant, deny, or rescind a substantial development permit pursuant to RCW 90.58.140 are heard by the SHB. RCW 90.58.180. However, a decision by a local government, such as the one in this case, that a development project does not fall within the jurisdiction of the SMA, is not reviewable by the SHB. RCW 90.58.180 (providing SHB with authority to hear appeals only on decisions to *grant*, *deny*, or *rescind* a substantial development permit); *Toandos Peninsula Ass'n v. Jefferson County*, 32 Wn. App. 473, 485, 648 P.2d 448 (1982).

Finally, local governments and Ecology are given joint enforcement authority. RCW 90.58.140(3) ("local government shall establish a program . . . for the administration and enforcement of the permit system"); RCW 90.58.210(1) (attorney general or attorney for local government "shall bring such injunctive, declaratory, or other actions as are necessary to insure that no uses are made of the shorelines of the state in conflict with the provisions and programs of this chapter"); RCW 90.58.210(2), (3) (Ecology or local government may issue cease and desist orders, require corrective action, or issue penalties if a party undertakes development on a shoreline without a permit).

LUPA, on the other hand, serves to establish "uniform, expedited appeal procedures and uniform criteria for reviewing such decisions, in order to provide consistent, predictable, and timely judicial review." RCW 36.70C.010. In so doing, it provides the "exclusive means of judicial review" of land use decisions. RCW 36.70C.030.[10] A "land use decision" is defined as

> a final determination by a local jurisdiction's body or officer with the highest level of authority to make the determination, including those with authority to hear appeals, on . . . (b) [a]n interpretive or declaratory decision regarding the application to a specific property of zoning or other ordinances or rules

---

[10] As Ecology argues, RCW 36.70C.030 does state that chapter 36.70C RCW does not apply to "[l]and use decisions of a local jurisdiction that are subject to review by a quasi-judicial body created by state law, such as the [SHB]." RCW 36.70C.030(1)(a)(ii). Because the decision at issue in this case is not appealable to the SHB, this exception does not apply.

regulating the improvement, development, modification, maintenance, or use of real property.

RCW 36.70C.020(1)(b). An appeal pursuant to LUPA must be filed within 21 days of the issuance of the land use decision. RCW 36.70C.040(3).

## B

### Applicability of LUPA

Samuel's asserts that Ecology was required to file a LUPA petition in order to challenge the land use decisions made by the City as violations of the SMA. Because the SMA prohibits local governments from authorizing development on shorelines unless it first determines that the development is consistent with the "policy and provisions of the [SMA] and the master program," WAC 173-27-140(1), Samuel's argues that the City made "land use decisions" concerning the shoreline jurisdiction on at least three occasions: when it issued the fill and grade permit, when it issued the building permit, and when it rescinded the stop work order. Relying on *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 4 P.3d 123 (2000), Samuel's contends that Ecology waived its right to challenge the City's decision that the Samuel's project was outside the shoreline jurisdiction by failing to challenge the City's decision to issue the permits and to rescind the stop work order.

Ecology responds that it does not contend that the fill and grade or the building permits were improper, but only that a shoreline permit was required. Ecology asserts that because the City never issued a formal decision as to the shoreline jurisdiction, there is nothing for it to appeal. We disagree.

First, Ecology's current position is in contrast to its earlier position that a substantial development permit could not be issued for this area and that the fill would need to be removed. *See* Clerk's Papers (CP) at 792-93. Thus, in effect it did contend that the fill and grade permit was

improper. Second, because WAC 173-27-140 prohibits local governments from authorizing shoreline development that is inconsistent with the SMA, the City's issuance of the fill and grade and building permits necessarily required a determination that the project was outside the shoreline jurisdiction. Under LUPA, a court may grant relief if the party seeking relief shows that "[t]he land use decision is an erroneous interpretation of the law" or that "[t]he land use decision is a clearly erroneous application of the law to the facts[.]" RCW 36.70C.130(1)(b), (1)(d). Thus, Ecology could have challenged the issuance of those permits on the basis that they are inconsistent with the SMA because no substantial development permit was issued.[11]

Ecology next asserts that the Court of Appeals was correct when it concluded that the LUPA procedures could not be applied to the City's decision in this case. The court held that the City's action was not "final" for purposes of LUPA because RCW 90.58.050 "gives [Ecology] responsibility for reviewing local government decisions to ensure compliance with the act." *Samuel's Furniture, Inc. v. Dep't of Ecology*, 105 Wn. App. 278, 285, 19 P.3d 474 (2001). In so concluding, the court relied on *Toandos* as well as RCW 90.58.210(1) and WAC 173-27-260, which give Ecology and

---

[11] The dissent's reliance on *Toandos Peninsula Ass'n v. Jefferson County*, 32 Wn. App. 473, 648 P.2d 448 (1982) to support its position that the City's implicit decision that the project was outside the shoreline jurisdiction was distinct from the City's decisions to issue the fill and grade permit and to rescind the stop work order is misplaced. *See* dissent at 472-73. First, *Toandos* was decided 13 years before LUPA was enacted; thus, the court there never had to address the issue presented in this case. Second, the court declined to rule on the applicability of the SMA in that situation. *See Toandos Peninsula Ass'n*, 32 Wn. App. at 485-86. Finally, contrary to the dissent and the *Toandos* court's contention that other land use decisions are separate and distinct from compliance with the SMA, WAC 173-27-140(1) prohibits a local government from authorizing development on shorelines unless it first determines that the development is consistent with the "policy and provisions of the [SMA]." A decision to issue a fill and grade or building permit for a project within the shoreline jurisdiction without a substantial development permit (as Ecology has argued occurred in this case) would seem to be contrary to the SMA. Thus, despite the dissent's assertion, other land use decisions may implicate the SMA. Furthermore, even if the two decisions were distinct and Ecology now concedes that the City's initial determination that the project was outside the shoreline jurisdiction was a decision subject to appeal, then it was required to appeal that decision within 21 days. *See infra* n.16.

the local government joint enforcement authority. *Samuels*, 105 Wn. App. at 284-86.

Samuel's contends that the Court of Appeals misinterpreted the SMA when it held that the land use decision in this case was not final for purposes of LUPA. It asserts that the Court of Appeals misreads the limits of RCW 90.58.050 in concluding that the City's decision was not final. Samuel's claims that the Court of Appeals used a definition of "finality" that is inconsistent with the traditional rules of appellate jurisdiction. We agree.

"Final" has a specific meaning in context of appellate jurisdiction. A "final decision" is "[o]ne which leaves nothing open to further dispute and which sets at rest cause of action between parties." BLACK'S LAW DICTIONARY 567 (5th ed. 1979). *See also Reif v. LaFollette*, 19 Wn.2d 366, 370, 142 P.2d 1015 (1943) (" 'A final judgment is such a judgment as at once puts an end to the action by declaring that the plaintiff has or has not entitled himself to recover the remedy for which he sues.' ") (quoting 1 HENRY CAMPBELL BLACK, A TREATISE ON THE LAW OF JUDGMENTS § 21 (2d ed. 1902)). "A judgment is considered final on appeal if it concludes the action by resolving the plaintiff's entitlement to the requested relief." *Purse Seine Vessel Owners Ass'n v. State*, 92 Wn. App. 381, 387, 966 P.2d 928 (1998). In contrast to a final decision, an "interlocutory" decision is one that is "not final," but is instead "intervening between the commencement and the end of a suit which decides some point or matter, but is not a final decision of the whole controversy." BLACK'S, *supra*, at 731.

A decision must be either final or interlocutory for appellate purposes. However, under the Court of Appeals interpretation of the term "final" in LUPA, it is unclear what the status of the City's decision is. According to the Court of Appeals, although the City's decision to issue the fill and grade permits was not final, it was also not interlocutory. As Samuel's asserts, the "question is not whether the municipal decision is potentially debatable, but whether it reaches the merits and terminates the permit process." Suppl. Br. of

Pet'rs at 6. Once the City determined that the permits should be issued, that was the end of the controversy. Samuel's received the relief it had requested. No additional issues remained. *See Reif*, 19 Wn.2d at 370.

Thus, the Court of Appeals interpretation of the term "final" appears to create a kind of nonfinal final decision depending on whether Ecology decides to "review" the City's actions. The decision is final if Ecology decides not to challenge the decision, but nonfinal, although not interlocutory, if it does. This is an incorrect reading of the term "final" for the purposes of LUPA's appellate jurisdiction.[12]

Relying on our decision in *Skamania County v. Columbia River Gorge Commission*, 144 Wn.2d 30, 26 P.3d 241 (2001), Samuel's also claims that when read in the context of the entire statutory scheme, RCW 90.58.050 has no effect on the finality of a local government's decision. Although this case involves different statutes, the reasoning of *Skamania County* is illustrative. In *Skamania County*, we were asked to decide whether the Gorge Commission had authority to invalidate a county's land use decision when it failed to appeal Skamania County's decision through the statutory appeal process. 144 Wn.2d at 35. The Gorge Commission argued that the Columbia River Gorge National Scenic Area Act, 16 U.S.C. §§ 544-544p, gave it plenary powers to enforce the Act, such that the appeals provision, § 544m(a)(2), did

---

[12] Furthermore, the Court of Appeals definition of "final" conflicts with the definition of finality in "land use decisions." RCW 36.70C.020(1) defines "land use decision" as a "final determination by a *local jurisdiction's body or officer* with the highest level of authority to make the determination, including those with authority to hear appeals . . . ." (Emphasis added.) Under LUPA, the definition of "local jurisdiction" includes only "a county, city, or incorporated town." RCW 36.70C.020(2). It does not include state agencies, such as Ecology. The "local jurisdiction's body or officer with the highest level of authority to make the determination" necessarily refers to that person or agency within a local jurisdiction and not a state body, which may have review authority over the local jurisdiction's decisions. Therefore, whether Ecology has review authority over the City's decision that the project is not within the shoreline jurisdiction does not affect the finality of the City's decision for appeal purposes under LUPA.

This conclusion, however, does not answer the question posed in this case. We must still decide whether Ecology has review authority over a local governmental determination that a project is not within the shoreline jurisdiction in order to determine whether Ecology was required to appeal the decision pursuant to LUPA.

not apply to it. 144 Wn.2d at 44. In support of its argument, the Gorge Commission relied on § 544m(a)(1), which states, " 'The Commission shall monitor activities of counties pursuant to [the Act] and shall take such actions as it determines are necessary to ensure compliance.' " 144 Wn.2d at 44 (alteration in original) (quoting 16 U.S.C. § 544m(a)(1)).

In determining whether the Gorge Commission had blanket authority to enforce the Act, we evaluated the plain language of the statutes, the general statutory scheme, and the policy in Washington favoring administrative finality of land use decisions. *Id.* at 44-49. Although we acknowledged that § 544m(a)(1), when read in isolation, might provide the Gorge Commission with the authority it asserted, we ultimately rejected this position because it was inconsistent with the statutory scheme as a whole as well as the policy favoring finality. *Id.* at 49.

*Statutory Interpretation of the SMA*

In this case, the Court of Appeals relied heavily on RCW 90.58.050, which states:

> This chapter establishes a cooperative program of shoreline management between local government and the state. Local government shall have the primary responsibility for initiating the planning required by this chapter and administering the regulatory program consistent with the policy and provisions of this chapter. The department shall act primarily in a supportive and *review capacity* with an emphasis on providing assistance to local government and on *insuring compliance with the policy and provisions of this chapter.*

(Emphasis added.) As in *Skamania County*, when read in isolation, the italicized portion of RCW 90.58.050 could lead to the conclusion that Ecology has the ability to review all decisions made by local governments. However, this conclusion is not supported when the provisions are read in the context of the entire statutory scheme. *See Tunstall v. Bergeson*, 141 Wn.2d 201, 211, 5 P.3d 691 (2000) (statutes should be interpreted in a manner that reconciles conflicting provisions and that is consistent with its stated goals);

*City of Seattle v. Fontanilla*, 128 Wn.2d 492, 498, 909 P.2d 1294 (1996) (an act must be construed as a whole).

Under the SMA, Ecology's primary role is to review and approve SMPs. RCW 90.58.080. In this sense, it is "reviewing" local government action. However, once an SMP has been approved, the SMA specifically grants local governments the *exclusive power* to administer the permit system. RCW 90.58.140(3). Nowhere in the statute is Ecology explicitly given the right to directly review a local government's decision regarding a substantial development permit.[13] In fact, a decision by a local government to grant or deny a permit is appealable by Ecology to the SHB. RCW 90.58.180(2). It would seem redundant to grant Ecology the right to appeal a local government's decision to grant or deny a permit to the SHB when it has the power to review and reverse that decision unilaterally. As we stated in *Skamania County*, "[w]e believe that had Congress intended to eviscerate the nearly universal rule of administrative finality in land use decisions and grant the Gorge Commission the unusual power that it claims to have, it would have said so expressly and unequivocally." 144 Wn.2d at 49. The same principle applies with equal force in this case.

In addition, Ecology and the Court of Appeals reading of RCW 90.58.050 would render no decision by a local government appealable. RCW 90.58.180(1) provides that any aggrieved person may appeal a "final" decision granting, denying, or rescinding a permit by a local government. Under Ecology and the Court of Appeals rationale, if RCW 90.58.050 grants Ecology the ability to review all local government decisions, then no decision by a local government would be final. Thus, no decision would be appealable to the SHB. This result would be contrary to the plain language of RCW 90.58.180 providing for appeal of these

---

[13] Ecology's approval of shoreline permits is statutorily limited. The SMA gives Ecology the responsibility of reviewing conditional use and variance permits for approval. *See* RCW 90.58.140(10), (6). However, the SMA does not give Ecology the authority to review any other local permit, such as the one issued in this case. Ecology's authority to review conditional use and variance permits cannot support the Court of Appeals' reasoning that the permit issued by Ferndale to Samuel's was not "final" for purposes of LUPA.

decisions to the SHB and is clearly not anticipated by the SMA generally.

Nor does the fact that the SMA provides Ecology with enforcement authority under RCW 90.58.210 enable Ecology to reverse local government decisions. RCW 90.58.210(1) provides that

> the attorney general or the attorney for the local government shall bring such injunctive, declaratory, or other actions as are necessary to insure that no uses are made of the shorelines of the state in conflict with the provisions and programs of this chapter, and to otherwise enforce the provisions of this chapter.

The ability of Ecology to bring an action under this section must be read in context with the other provisions of the SMA. For example, if this section provided Ecology with blanket authority to bring enforcement actions, there would be no reason for Ecology to appeal a city's decision to grant a permit to the SHB pursuant to RCW 90.58.180(2) when Ecology believes that the permit is in violation of the SMA. Furthermore, Ecology's enforcement authority is shared with local governments. Thus, it contemplates a cooperative effort on the part of Ecology and local governments in enforcing the SMA. Using RCW 90.58.210 to collaterally attack a local government decision would be at odds with the policy of cooperation encompassed in RCW 90.58.050.

We also disagree with Ecology that requiring it to appeal a local government decision pursuant to LUPA would impair its ability to ensure compliance with the Act.[14] Ecology, for example, would not be prevented from taking action against a party who completely ignores the shoreline permitting process or one who obtains a permit and then proceeds to violate the conditions of the permit. Nor would requiring Ecology to comply with the LUPA procedures prevent it from ensuring that local governments were

---

[14] The dissent incorrectly asserts that we presume that "because the legislature charged Ecology and local governments to work cooperatively and gave both Ecology and local governments enforcement authority, Ecology must always acquiesce to a local government's decision regarding the SMA's policy and provisions." Dissent at 471. To the contrary, we find that Ecology can and should disagree with a local government decision when it believes that it is in conflict with the SMA. We require only that Ecology follow the proper procedures when challenging that decision.

properly enforcing the provisions of their SMP and the SMA generally. By filing a LUPA petition challenging a local government decision to allow a land use action that is in conflict with the SMP or the SMA, Ecology would be enforcing the provisions of the SMA. Requiring Ecology to follow the procedures established in LUPA merely provides structure and finality to the enforcement process. Furthermore, RCW 90.58.210 provides that the attorney general or local government attorney may bring any "action" necessary to enforce the SMA. An appeal pursuant to LUPA of a local government's decision could be considered an action seeking to enforce the provisions of the SMA.

Ecology's enforcement authority under RCW 90.58.210(3) is limited to situations involving development on shorelines without a permit, and where there is a violation of the permit terms. *See* RCW 90.58.210(2). Thus, before Ecology may issue cease and desist orders, require corrective action, or issue penalties, Ecology's jurisdiction must first be established. Because local governments are given the exclusive authority to administer the permit system, RCW 90.58.140(3), their permit decisions may also determine whether development is within the jurisdiction of SMA. When a local decision concludes that there is no SMA jurisdiction, it would then be appropriate to require Ecology to appeal a decision to allow a land use action without obtaining a substantial development permit in order to establish its jurisdiction to issue penalties under RCW 90.58.210(3).

It would be redundant for the legislature to have specifically delineated Ecology's role in other provisions of the SMA if it then provided Ecology with blanket authority to enforce the SMA under RCW 90.58.050. *See Skamania County*, 144 Wn.2d at 48 (finding it redundant for Congress to have expressly delegated certain powers to the Gorge Commission if it already had broader powers under § 544m(a)(1)). For example, pursuant to its mandate to enforce the provisions of the SMA, Ecology must review and approve SMPs submitted by local governments (RCW 90.58.090) to ensure that they comply with the SMA. Ecology may also appeal a local government's decision to

issue or deny a permit (RCW 90.58.180(2)), or bring a declaratory or injunctive action against parties violating the SMA (RCW 90.58.210). If RCW 90.58.050 grants Ecology general enforcement authority, why would these provisions be necessary? Reading the SMA as a whole, it is clear that RCW 90.58.050 was merely meant to emphasize the cooperative roles of Ecology and local governments and not to give Ecology free rein to unilaterally overturn decisions made by local governments.

## Policy of Finality in Land Use Decisions

Requiring Ecology to file a LUPA petition to contest a local government decision to allow a land use action when it has determined that the action is not within the shoreline jurisdiction is also consistent with this state's "strong public policy favoring administrative finality in land use decisions." *Skamania County*, 144 Wn.2d at 48. *See also Sintra, Inc. v. City of Seattle*, 119 Wn.2d 1, 5, 829 P.2d 765 (1992) (concluding that a "body of cogent, workable rules upon which regulators and landowners alike can rely" is essential to resolving land use regulation disputes). We have stated that " '[i]f there were not finality [in land use decisions], no owner of land would ever be safe in proceeding with development of his property.' " *Skamania County*, 144 Wn.2d at 49 (alteration in original) (quoting *Deschenes v. King County*, 83 Wn.2d 714, 717, 521 P.2d 1181 (1974)).

The blanket enforcement authority sought by Ecology is in sharp contrast to the policy favoring finality in land use decisions. Under Ecology's position, even though a party relies in good faith on a local government determination that the SMA does not apply, and therefore proceeds with construction, it may still be subject to Ecology enforcement action weeks, months, and even years later for failing to obtain a substantial development permit. These belated enforcement actions could result in civil and/or criminal penalties being issued against the party as well as the potential loss of thousands of dollars in construction costs that have already been incurred. Moreover, Ecology's position fails to give a party any notice of an impending

enforcement action. Ecology's interpretation of the SMA would leave land owners and developers unable to rely on local government decisions—precisely the evil for which LUPA was enacted to prevent.

Samuel's case is illustrative.[15] Relying on the City's issuance of a fill and grade permit in August 1998, Samuel's placed 14,000 cubic yards of fill on its site. In April 1999, the City issued Samuel's a building permit and Samuel's began preconstruction demolition. By the time Ecology forced Samuel's to suspend work in August 1999, Samuel's had expended approximately $491,000 in costs associated with the expansion project. CP at 771-72. Because Ecology concluded that the area should have a conservancy rating, the only option available to Samuel's to avoid enforcement action by Ecology was to remove the fill. *See* CP at 792-93. Under Ecology's position that at least part of Samuel's existing building is within the 100-year floodplain, Ecology could take enforcement action against Samuel's for failing to obtain a substantial development permit for that project even though the building was constructed more than 10 years ago.

In contrast to the authority sought by Ecology, LUPA is consistent with the policy in favor of finality of land use decisions. It specifically authorizes a system of "uniform, expedited appeal procedures and uniform criteria for reviewing such decisions, in order to provide consistent, predictable, and timely judicial review." RCW 36.70C.010. In so doing, it provides the "exclusive means of judicial review" of land use decisions. RCW 36.70C.030. Requiring Ecology to appeal local government decisions to issue a land use permit because the project is not within the shoreline jurisdiction enables land owners and developers to rely on local government decisions *and* allows Ecology to enforce

---

[15] The dissent criticizes our reference to the facts in this case as unnecessary. Dissent at 464-65. However, following the guidelines in *Skamania County*, we must consider Washington's policy of administrative finality in land use decisions. This necessarily requires us to consider the actual effect of a particular statutory interpretation. Thus, the facts of this case are relevant to our decision.

the provisions of the SMA when it believes that the local government has acted in violation of the SMA.

## C

### Propriety of Applying LUPA

Ecology argues that SMA should govern the decision in this case because LUPA was not intended to repeal the SMA. Ecology, however, misunderstands the role of LUPA is this situation. LUPA does not amend the SMA, but instead fills a void left by the SMA. In *Wenatchee Sportsmen*, we held that because the Growth Management Act, chapter 36.70A RCW, did not provide for appeals of certain types of land use decisions to the Growth Management Hearings Board, a challenge to those decisions must be made through a LUPA petition in superior court. 141 Wn.2d at 178. Similarly, because the SMA does not provide for review of the type of question presented here, LUPA provides the avenue for appealing this decision.

Ecology also contends that requiring it to appeal a local government's decision pursuant to LUPA removes the question from review by the SHB, which defeats the legislative intent of having the SHB decide these issues in the first instance in order to ensure "consistent development of the state's shorelines." Suppl. Br. of Ecology at 8. Because the City's jurisdictional determination is not directly appealable to the SHB, Ecology contends that the proper avenue for review is to allow Ecology to issue penalties against the alleged violator and then allow the violator to appeal the penalties to the SHB in order to determine jurisdiction.

Although review by the SHB may promote uniform development of the state's shorelines, we find this rationale insufficient to overcome the strong public policy in favor of finality of land use decisions and because of the burden it places on land owners and developers. Ecology's position fails to provide land owners and developers with any assurance that they may proceed with a project without

risk of later action by Ecology. More importantly, it does not in any way limit the time frame in which Ecology may take action. Land owners and developers are therefore left to proceed at their own peril. Finally, this avenue of review may add substantial and unnecessary costs to land owners and developers by requiring them to refrain from construction while appealing the penalties imposed by Ecology to the SHB.

## D

### Notice

Ecology appears to argue that because it did not receive notice of the City's issuance of the fill and grade and the building permits, it cannot be expected to appeal those decisions under LUPA. The Court of Appeals accepted this argument, holding that it would be "inconsistent with [Ecology's] charge under the SMA to bar it from taking enforcement action because it failed to file a LUPA appeal within the 21-day window" where Ecology was not informed of the decision. *Samuel's Furniture*, 105 Wn. App. at 286.

Samuel's responds that Ecology was given notice of Samuel's expansion project. Samuel's contends that Ecology was put on general notice of the project when it received the SEPA form, which specifically stated that the project was within the "immediate vicinity" of the Nooksack River and in the 100-year floodplain. Furthermore, Ecology had actual knowledge of the City's decision to withdraw the stop work order. Alternatively, Samuel's argues that Ecology's lack of specific notice was the result of its failure to follow-up on the information provided in the SEPA form. Finally, Samuel's contends that because Ecology, through its rule-making authority, could have promulgated rules requiring local governments to notify it of such decisions; its failure to do so does not entitle it to special relief.

We agree with Samuel's that Ecology had general notice of the Samuel's expansion project. In the SEPA worksheet

filed with Ecology, Samuel's affirmatively stated that the project was in the "immediate vicinity" of the Nooksack River and that it was within the 100-year floodplain of the Nooksack River. CP at 486. According to Ecology's position that the shoreline jurisdiction extended to the FEMA floodway and arguably the 100-year floodplain, this answer potentially places the project either within the shoreline jurisdiction or in very close proximity to it. *See* CP at 792-93. Thus, Ecology's assertion that it was unaware of the project's proximity to the shoreline is untenable. Moreover, Ecology was put on specific notice of the City's decision to rescind the stop work order because of its determination that the project was not within the shoreline jurisdiction. Ecology, however, still failed to file a LUPA petition.

Regardless of the specificity of the notice actually received by Ecology in this case, LUPA does not require that a party receive individualized notice of a land use decision in order to be subject to the time limits for filing a LUPA petition. RCW 36.70C.040(4) states that in calculating the 21-day time period to file a land use petition with the superior court, the 21 days will commence:

(a) Three days after a written decision is mailed by the local jurisdiction or, if not mailed, the date on which the local jurisdiction *provides notice that a written decision is publicly available*;

(b) If the land use decision is made by ordinance or resolution by a legislative body sitting in a quasi-judicial capacity, *the date the body passes the ordinance or resolution*; or

(c) If neither (a) nor (b) of this subsection applies, the date the decision is *entered into the public record*.

(Emphasis added.) Thus, LUPA seems to require merely that a local jurisdiction provide general public notice by virtue of publication of the land use decision. Because LUPA defines "person" to include all governmental entities or agencies, RCW 36.70C.020(3), Ecology is not entitled to specific notice of the land use decision.

The concept of requiring notice before an action can be taken stems from due process. Due process generally re-

quires that a state provide a person with notice and an opportunity to be heard before it can deprive him or her of life, liberty, or property. *Zinermon v. Burch*, 494 U.S. 113, 127-28, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950). However, the due process clause does not protect government entities from state action. *City of Newark v. New Jersey*, 262 U.S. 192, 196, 43 S. Ct. 539, 67 L. Ed. 943 (1923) (political subdivisions cannot invoke protections of the Fourteenth Amendment against a state); *Moses Lake Sch. Dist. No. 161 v. Big Bend Cmty. Coll.*, 81 Wn.2d 551, 557-58, 503 P.2d 86 (1972) (rejecting due process challenge against state by local school district). Therefore, a government entity cannot claim lack of notice as a defense to its failure to follow state law. Its remedy is to change the system through legislative action or administrative rule making. As Samuel's argues, to the extent that Ecology desires specific notice of a local government's decision that a particular project does not fall within the shoreline jurisdiction, Ecology can promulgate rules to ensure that this occurs. RCW 90.58.200. Because Ecology has chosen not to do so, it cannot now complain that it lacked notice of the City's decision in this case.

## III

We hold that Ecology must file a timely LUPA petition challenging a local government's decision to allow a development project after it has determined that the project at issue is not within the shoreline boundary. If Ecology fails to file a LUPA petition under such circumstances, it cannot collaterally challenge the local government's determination that the project is not within the shoreline jurisdiction by bringing independent enforcement actions against the property owner or developer. In this case, because Ecology failed to file a LUPA petition challenging any of the City's land use decisions relating to the Samuel's expansion

project within 21 days,[16] it can no longer challenge the City's determination that the project is not within the shoreline jurisdiction.[17]

The decision of the Court of Appeals is reversed.

SMITH, SANDERS, IRELAND, and CHAMBERS, JJ., concur.

OWENS, J. (dissenting) — In this case, we are asked to answer the purely legal question of whether the 21-day time limit mandated in the Land Use Petition Act (LUPA), chapter 36.70C RCW, applies to the Department of Ecology (Ecology) when it challenges a local government's potentially erroneous decision that a building project requires no application for a substantial development permit under the Shoreline Management Act of 1971 (SMA), chapter 90.58 RCW. The Court of Appeals concluded that the LUPA time limit was not intended to impair Ecology's ability to fulfill its review and enforcement responsibilities under RCW 90-.58.050 and .210(1). Because I agree with that conclusion, I respectfully dissent.

That we have before us a purely legal question, involving the scope of LUPA and the vitality of certain protective provisions in the SMA, may be easily forgotten as one reads the majority opinion. There, the focus drifts from the

---

[16] Because LUPA requires a party to exhaust its administrative options before bringing a land use petition, RCW 36.70C.060, Ecology would also have been required to appeal the City's decisions pursuant to the procedures established by the City. Because it failed to do so, it would be similarly barred from bringing a LUPA land use petition in superior court.

[17] The dissent states that our position that Ecology could have challenged the City's decisions to issue the fill and grade and building permits and to rescind the stop work order is "contrary to this court's holding in *Wenatchee Sportsmen Ass'n.*" Dissent at 474. The dissent's position is premised on its conclusion that the City's implicit determination as to the SMA's jurisdiction was subject to appeal. *Id.* at 468-69. Ecology, however, has always maintained that this decision could not be appealed because it was not a formal, written decision. *See* Answer to Pet. for Review at 11; Br. of Appellant Ecology at 15. Thus, under Ecology's stated position, there was no earlier decision to appeal. If Ecology now concedes that the City's determination that the project was outside the shoreline jurisdiction was a final decision, then we agree that Ecology could not have collaterally challenged that decision. It would, however, have still been required under LUPA to appeal it within 21 days. Because Ecology did not do so, it has similarly waived its ability to challenge the City's decision. The result is the same.

statutory question that is before us to factually fuzzy issues that decidedly are not. First, whether the Samuel's Furniture, Inc. (Samuel's Furniture) project does or does not lie within shoreline jurisdiction is not for this court to decide, nor should any anticipated resolution of that issue have any bearing on our statutory analysis. The trial court expressly did not reach that issue; consequently, the Court of Appeals, having reversed the trial court's extension of LUPA, remanded the question of shoreline jurisdiction, while noting the absence of a "fully developed record." *Samuel's Furniture, Inc. v. Dep't of Ecology*, 105 Wn. App. 278, 289, 19 P.3d 474 (2001). Second, our statutory analysis cannot be based on our view of the conduct of the parties—an uncertain view at best, given that the constellation of facts surrounding Ecology's negotiations with the City of Ferndale (City) and Samuel's Furniture takes a shifting shape. In no way does our answering the sole legal question before us depend upon our determining whether Ecology was responsibly, patiently assisting the City and Samuel's Furniture or, rather, was exercising its enforcement authority in so dilatory a manner as to give Samuel's Furniture a possible equitable defense. Nor should our statutory analysis be affected by the hypothetical issue of whether, *if* Samuel's Furniture had applied for a substantial development permit, that application would have been granted or denied. Like the questions regarding the project's location and Ecology's response, the success of an application that was never made is a question that has no bearing on whether LUPA, enacted 24 years after the SMA, was intended to narrow to 21 days Ecology's window for discovering and challenging a local government's alleged noncompliance with an SMA provision.

Likewise, the introduction of immaterial facts contributes nothing to our assessment of the interplay of LUPA and the SMA, although it may serve instead to increase or undermine sympathy for one party or the other. For example, that Samuel's Furniture went forward with the project while Ecology's appeal was pending was not estab-

lished in the record but was a fact supplied at oral argument. While facts concerning the status of the building project—such as its cost at various stages or the number of cubic yards of fill that had to be placed on the site—could have some bearing on a future consideration of damages or remedies, such facts are simply irrelevant to the question of statutory analysis before this court.[18] Again, our duty here is to examine the relevant provisions in LUPA and the SMA and resolve the conflict between the parties, as well as between the trial court and Court of Appeals, regarding the intended operation of the two statutes.

When the legislature enacted the SMA in 1971, it found "a clear and urgent demand for a planned, rational, and concerted effort, *jointly performed* by federal, state, and local governments, to prevent the inherent harm in an uncoordinated and piecemeal development of the state's shorelines." RCW 90.58.020 (emphasis added). "[D]eclar-[ing] that the interest of all of the people shall be paramount in the management of shorelines," *id.*, the legislature provided for a "cooperative program of shoreline management between local government and the state":

> Local government shall have the primary responsibility for initiating the planning required by this chapter and *administering* the regulatory program *consistent with the policy and provisions of this chapter*. The department shall act primarily in a supportive and *review capacity* with an emphasis on providing assistance to local government and on *insuring compliance with the policy and provisions of this chapter*.

RCW 90.58.050 (emphasis added). Significantly, prior to that 1995 amendment to RCW 90.58.050, the statute had assigned local government the responsibility simply for "administering the regulatory program of this chapter,"

---

[18] The majority inscrutably asserts that the principle of administrative finality makes these facts relevant. Majority at 459 n.14. It does not. Because we do not base statutory interpretation on case-specific equitable principles, whether the Samuel's Furniture project was suspended or completed can have no bearing on our statutory analysis. The question here is not how our interpretation will impact Samuel's Furniture but rather whether the legislature intended LUPA to limit Ecology's opportunity to discover and contest a local government's potentially erroneous decision regarding SMA compliance.

former RCW 90.58.050 (1971), but the 1995 amendment emphasized that the local government was responsible for "administering the regulatory program *consistent with the policy and provisions of this chapter.*" That change thus added language that made the local government's duty parallel to Ecology's responsibility for *"insuring compliance with the policy and provisions of this chapter."* In sum, RCW 90.58.050 plainly underscores that, in the first instance, local governments are bound to administer the shoreline regulations in keeping with the SMA's "policy and provisions" and that, thereafter, Ecology is charged with exercising its "review capacity" in a way that emphasizes assisting the local governments and "insuring [their] compliance" with the SMA's "policy and provisions."

Consistent with RCW 90.58.050, which makes Ecology responsible for exercising its "review capacity" and "insuring compliance" with the shoreline regulations, the SMA accords Ecology, as well as local governments, the power to bring enforcement actions: "[T]he attorney general or the attorney for the local government shall bring such injunctive, declaratory, or other actions as are necessary *to insure* that no uses are made of the shorelines of the state *in conflict with the provisions and programs of this chapter,* and *to otherwise enforce the provisions of this chapter.*" RCW 90.58.210(1) (emphasis added); *see Hedlund v. White,* 67 Wn. App. 409, 836 P.2d 250 (1992); *see also* WAC 173-27-260. Further, the legislature "exempted [the SMA] from the rule of strict construction" and stated that the SMA "shall be liberally construed to give full effect to the objectives and purposes for which it was enacted." RCW 90.58.900.

In this case, the SMA provision with which Ecology has sought to ensure compliance is the requirement that a developer apply for a "substantial development permit" for "any development of which the total cost or fair market value exceeds two thousand five hundred dollars, or any development which materially interferes with the normal public use of the water or shorelines of the state[.]" RCW

90.58.030(3)(e), .140(2). The parties do not dispute that, if the Samuel's Furniture project lies within shoreline jurisdiction, application for a substantial development permit would be required. Whereas Ecology receives notice of all decisions by local jurisdictions concerning applications for substantial development permits, including applications for variances and conditional uses, Ecology does not receive notice of a local government's implicit decision that an application for a substantial development permit is *not* required. RCW 90.58.140(6); *see* WAC 173-27-130 (describing the "complete submittal" that the Department receives when applications for such permits are granted or denied). A local government's grant or denial of an application for a substantial development permit is appealable to the Shorelines Hearings Board (SHB), as are all enforcement actions by Ecology. RCW 90.58.180, .210(4). Just as no SMA provision requires that local governments give Ecology notice of implicit decisions not to require an application for a substantial development permit, no provision of the SMA makes those implicit, unwritten decisions appealable directly to the SHB.

The relevant LUPA provisions are similarly straightforward. First, LUPA was enacted in 1995 "to reform the process for judicial review of *land use decisions* made by local jurisdictions, by establishing uniform, expedited appeal procedures and uniform criteria for reviewing such decisions, in order to provide consistent, predictable, and timely judicial review." RCW 36.70C.010 (emphasis added). LUPA defines a "[l]and use decision" as "a *final* determination by a local jurisdiction's body or officer with the highest level of authority to make the determination." RCW 36.70C.020(1) (emphasis added). Such appealable final decisions include "[a]n interpretative or declaratory decision regarding the application to a specific property of zoning or other ordinances or rules regulating the improvement, development, modification, maintenance, or use of real property." RCW 36.70C.020(1)(b). LUPA exempts "[l]and use decisions of a local jurisdiction that are subject to

review by a quasi-judicial body created by state law, such as the shorelines hearings board." RCW 36.70C.030(1)(a)(ii). A land use decision is not "final" within the meaning of LUPA unless "[t]he petitioner has exhausted his or her administrative remedies to the extent required by law." RCW 36.70C.060(2)(d); *see W. Coast, Inc., v. Snohomish County*, 104 Wn. App. 735, 742, 16 P.3d 30 (2000) (stating that "[j]udicial review of a land use decision may not be obtained under RCW 36.70C.060(2)(d) of LUPA unless all the administrative remedies have been exhausted"). To be timely, a petition must be filed and served on the necessary parties "within twenty-one days of the issuance of the land use decision," a decision that may be issued in writing or orally. RCW 36.70C.040(3), .070(4) (requiring that the petition provide "a duplicate copy of the decision, or, if not a written decision, a summary or brief description of it").

If we are to apply the SMA and LUPA provisions to the local government decision at issue in this case, we must be clear at the outset about exactly what the local government decision was that Ecology was challenging. Ecology was attempting to correct the City's unwritten decision that Samuel's Furniture was not required to apply for a substantial development permit. Ecology contends that it was acting within its statutory authority: under RCW 90-.58.050, which gives Ecology its "review capacity" and charges it with "insuring compliance with" the SMA's "provisions," Ecology contacted the City to review the City's decision and to attempt to ensure Samuel's Furniture's compliance with RCW 90.58.140(2), the SMA provision that requires a substantial development permit. Although at the time of Samuel's Furniture's declaratory action Ecology had not exercised its authority under RCW 90.58.210(1) to enforce the permit provision, the parties were aware that Ecology could act pursuant to that statutory authority.

In light of the legislature's clear intent to require Ecology to review local government actions and safeguard the SMA provisions, the majority's conclusion that the City's decision was a *final* land use decision ripe for a LUPA appeal is

untenable. The majority can point to no provision in LUPA that negates or curbs the review and enforcement authority that the legislature plainly gave Ecology in RCW 90.58.050 and .210(1). LUPA, in fact, shows deference to the SMA by exempting from its purview any decisions appealable to the SHB. Consequently, I would hold that, given RCW 90.58.050 and .210(1), the City's unwritten decision not to require Samuel's Furniture to apply for a substantial development permit could not have been a *final* land use decision subject to a LUPA appeal.

Some contentions in the majority opinion warrant comment. First, the majority appears to claim that RCW 90.58.050 conflicts with or somehow obviates the need for RCW 90.58.180(2), which specifically gives Ecology the right to seek the SHB's review of a local government's decision granting or denying a permit application. But there is no conflict between, on the one hand, the legislature's broad statement of Ecology's review and enforcement duties and, on the other, the legislature's enactment of special procedures for Ecology's review and appeal of particular types of local government action. Indeed, although the SMA made no specific provision for the local government decision at issue in this case (a potentially erroneous decision that no application was required), the legislature expressly provided that, as to all local government decisions approving or denying permit applications, Ecology "shall" receive notice and "may obtain review" by petitioning the SHB within 21 days of the filing of notice. RCW 90.58.140(6), .180(2). The presence in the SMA of special notice and appeal requirements for some matters in no way vitiates the overarching charge of RCW 90.58.050, wherein the legislature assigned Ecology the function of reviewing local government decisions and ensuring compliance with SMA provisions. Conversely, by conferring review and enforcement responsibilities in RCW 90.58.050, the legislature did not foreclose its right to enact in RCW 90.58.140(6) and .180(2) the notice and appeal procedures applicable to certain local government actions.

A second perplexing claim in the majority's statutory analysis is that Ecology's reliance on its enforcement authority under RCW 90.58.210(1) would "be at odds with [the] policy of cooperation encompassed in RCW 90.58.050." Majority at 456. Indeed, the majority claims that RCW 90.58.210(1) does not give Ecology the right "to reverse local government decisions." *Id.* at 456. But RCW 90.58.050 and .210(1) work together seamlessly: the former requires Ecology to act in a "review capacity with an emphasis on providing assistance to local government and on insuring compliance with the policy and provisions" of the SMA; the latter, consistent with that charge and borrowing some of its language, provides that Ecology, through the attorney general, may take the necessary actions "to insure that no uses are made of the shorelines of the state in conflict with the provisions and programs of [the SMA], and to otherwise enforce the provisions" of the SMA. The majority apparently presumes that, because the legislature charged Ecology and local governments to work cooperatively and gave both Ecology and local governments enforcement authority, Ecology must always acquiesce to a local government's decision regarding the SMA's policy and provisions.[19] Such a presumption ignores the plain language of the two complementary provisions, RCW 90.58.050 and .210(1), and effectively permits any local government to look the other way rather than require a developer to apply for a substantial development permit.[20]

---

[19] The majority protests that Ecology's alternative to acquiescence is "*only* . . . [to] follow the proper procedures"—by which the majority means that Ecology must appeal the local government's implicit decision within 21 days. Majority at 456 n.13 (emphasis added). That alternative is illusory, however, since it rests on Ecology's ability to receive notice of such decisions telepathically. Why Ecology should be expected to intuit the occurrence of such decisions is especially unclear, given that nothing in the record establishes the date on which the City reached its decision that no application for a substantial development permit was required. Thus, the majority has, in effect, determined that, as an alternative to acquiescence, Ecology need *only* appeal within 21 days an undated local government decision—and do so without having received any notice of that undated decision.

[20] At oral argument, the following question was posed to counsel for Samuel's Furniture: "How would a good citizen protect the shorelines . . . from a

An especially troubling aspect of the majority opinion is the majority's willingness to adopt Samuel's Furniture's mischaracterization of the decision that Ecology was challenging. Although Ecology's focus was on challenging the City's noncompliance with the SMA provision requiring an application for a substantial development permit, Samuel's Furniture blurs and shifts that focus, contending that Ecology was obliged to file a LUPA petition to challenge at least three land use decisions: the City's issuance of the fill and grade permit on August 28, 1999; its issuance of the building permit in April 1999; and its rescinding of the stop work order on August 10, 1999. The flaw in this thinking is that Ecology was not objecting to the issuance of those permits but to their issuance in the absence of a substantial development permit.

That a local government's issuance of a building permit is an action distinct from a decision regarding an SMA substantial development permit was evident in *Toandos Peninsula Ass'n v. Jefferson County*, 32 Wn. App. 473, 648 P.2d 448 (1982). There, the Court of Appeals determined that, although a comprehensive plan that excluded campground facilities did not preclude issuance of a building permit for such facilities, there likely remained "a serious question" regarding the project's compliance with the SMA. *Id.* at 486. Given the state of the record, the court declined to rule on the applicability of the SMA, but the court went on to explain that, in those cases where the local government improperly determines that a site lies outside of shoreline jurisdiction, "[t]he Attorney General and the prosecuting attorney of the county are specifically empowered and directed to initiate appropriate court actions to insure that 'no uses are made of the shorelines of the state in conflict with the provisions and programs of this chapter, and to otherwise enforce the provisions of this chapter.'" *Id.* at 485

city . . . willing to turn a blind eye to the SMA . . . ? Are you saying that Ecology could do nothing . . . ?" Counsel replied, "Well, I would say Ecology cannot do anything." TVW, Washington State's Public Affairs Network, Wash. State Supreme Court oral argument, *Samuel's Furniture v. Dep't of Ecology* (Jan. 17, 2002), *audio available at* http://www.tvw.org.

(quoting RCW 90.58.210). The *Toandos* court emphasized that it was "simply reviewing the issuance of permits by the county building officer" and that it "believe[d] the question of compliance with the [SMA] should be reserved to another day" in enforcement proceedings under RCW 90.58.210. *Toandos*, 32 Wn. App. at 486.

The majority criticizes our reliance on *Toandos*. *See* majority at 451 n.11. First, that *Toandos* predates LUPA is irrelevant to the key point that the *Toandos* court perceived two distinct actions—the local government's grant of a building permit and Ecology's determination of compliance with the SMA. Nothing in LUPA negates that distinction; in fact, a court's first step in applying LUPA's procedures is to define the particular land use decision at issue. In that regard, the *Toandos* court is actually more consistent with LUPA than is the majority in the present case. Whereas the *Toandos* court took the surefooted step of identifying distinct government actions, the majority in this case conflates various local government decisions—the implicit decision to require no SMA permit, two written construction permits, and a written stop work order—and vaguely bootstraps the SMA permit decision to one or all of the subsequent written decisions. Second, the majority claims that *Toandos* is inapplicable because the court declined to decide the SMA permit issue. But what we look to here is the *Toandos* court's essential preliminary determination that the local government's building permit was an action distinct from Ecology's determination of SMA compliance. That the *Toandos* court declined to rule on the applicability of the SMA does not affect the import of the *Toandos* court's necessary first step.

WAC 173-27-140(1) likewise makes clear that the determination of shoreline jurisdiction is distinct from the granting of a building permit: "No authorization to undertake use or development on shorelines of the state shall be granted by the local government unless upon review the use or development is determined to be consistent with the policy and provisions of the Shoreline Management Act and the

master program." The determination of shoreline jurisdiction precedes the issuance of any development permits. Nevertheless, the majority merges the City's decision regarding shoreline jurisdiction with the City's decisions granting the grade and fill and building permits, thereby adopting Samuel's Furniture's view that Ecology could have appealed the City's prior, implicit shoreline jurisdiction decision by filing a LUPA petition within 21 days of any of the other three decisions.

The majority's theory that Ecology could challenge the local government's prior SMA jurisdiction decision by appealing the local government's subsequent grade and fill or building permits is contrary to this court's holding in *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 4 P.3d 123 (2000). There, this court held that the Wenatchee Sportsmen Association, because it had failed to appeal within 21 days Chelan County's 1996 approval of a site-specific rezone, could not challenge the validity of that rezone in a 1998 LUPA appeal of the County's approval of a development proposal for the site. The *Wenatchee Sportsmen* court concluded that the only zoning related issue that could be considered in the LUPA appeal was simply whether the application to develop the previously rezoned property complied with the relevant zoning ordinances. Thus, the fundamental holding in *Wenatchee Sportsmen* is that, even where a later land use decision is contingent upon an earlier land use decision, the earlier decision must be contested within 21 days of its issuance and cannot be initially raised beyond that deadline in a timely appeal of the later decision. Applying that holding to the present case (and accepting solely for the sake of argument that the City's decision not to require a permit application was a "land use decision" under LUPA),[21] Ecology would not be permitted to appeal the City's prior shoreline jurisdiction

---

[21] In attempting to respond to this argument, the majority apparently overlooks our phrase "accepting . . . for the sake of argument." *See* majority at 464 n.16. Ecology has consistently maintained that the shoreline jurisdiction determination was not a "land use decision" under LUPA; in contrast, Samuel's Furniture has repeatedly asserted that shoreline jurisdiction decisions are appealable land use decisions.

decision in a LUPA appeal of the fill and grade permit. The majority opinion disregards the holding in *Wenatchee Sportsmen* when it adopts Samuel's Furniture's position that the City's shoreline jurisdiction determination was a final decision under LUPA and that Ecology could have contested that decision in a LUPA appeal of any one of the City's three subsequent land use decisions.

In sum, I believe the majority opinion undercuts the legislative intent apparent in the relevant provisions of the SMA and LUPA. I agree with the Court of Appeals that application of the 21-day LUPA deadline to the City's unwritten, implicit shoreline jurisdiction decision is inconsistent with Ecology's review and enforcement duties under RCW 90.58.050 and .210(1) since "it is possible that development permits could be improperly issued for projects within shoreline jurisdiction that do not immediately come to [Ecology's] attention." *Samuel's Furniture*, 105 Wn. App. at 285-86. The SMA provides for SHB review not only of local government decisions granting or denying applications for substantial development permits but also of enforcement decisions by Ecology concerning such permits. That LUPA exempts land use decisions that are reviewable by the SHB supports the conclusion that the legislature never intended LUPA to control in the exceptional case where a local government mistakenly concludes that no application for a substantial development permit is necessary. RCW 90.58.050 and .210(1) anticipate that such disagreements between Ecology and local governments will arise and that their resolution will be subject to review by the SHB. The majority opinion unwisely removes from SHB review a dispute regarding an SMA permit and fails to explain how Ecology, in light of this court's holding in *Wenatchee Sportsmen*, could have ever filed a timely LUPA appeal of the City's threshold decision that no substantial development permit was required.

---

*See, e.g.*, Pet. of Samuel's Furniture for Discretionary Review at 1-2, Reply Mem. of Samuel's Furniture at 13.

I would affirm the Court of Appeals.

ALEXANDER, C.J., and JOHNSON and MADSEN, JJ., concur with OWENS, J.

After modification, further reconsideration denied January 31, 2003.